Good morning. Good morning. Thanks. Yeah, good morning. Good morning. And may it please the Court, I'd like to begin with our claim that the studios conducted a horizontal boycott of secondary filtering companies. Now, the studios do not deny that they have never done business with any filtering company, so the only question here is whether we plausibly allege that the studios coordinated the boycott rather than each studio boycotting independently. The most direct evidence of the studios' collusion is the DGA agreement. And here, again, the studios do not dispute that if the DGA agreement is ambiguous, if we have at least a permissible interpretation of the text, then that's enough to allege collusion. And you can get to that spot with the text of the DGA agreement for at least two reasons. First, the way that the DGA agreement operates is to ban all edits without the director's participation, and there's, of course, no exception for filtering streaming by secondary companies. Because it predates any of that, right? Doesn't this agreement, this collective bargaining agreement, date back several decades before we had this technology? The initial language does, but that just means that they used language that was broad enough to then encompass the situation here. And in 2014, I believe, is when it first mentioned streaming. That's what it calls new media. And so they were clearly contemplating streaming, and now they are, in fact, applying it that way. And all the studios' conduct is exactly what you would expect if the DGA agreement did cover filtering. But another point on the text, because I do think that's important, at least to get us to the ambiguity to overcome the motion to dismiss, according to the studios, the agreement only covers those specific scenarios that are discussed in Article 7. But if that's true, then as long as the studios are clever or creative enough to avoid one of those situations, they can make all the edits they want to a director's work, and the director has no say. And so given the purpose and structure of the agreement, we don't think that makes any sense. And to be clear, again, for the studios to prevail on this point, they have to show that their interpretation is unambiguously correct. And we just don't think that they have pointed to any text that that would do so. We also have other evidence that shows not only coordination generally, but that the coordination derives from the DGA agreement. As one example, we have Mark Fleming's comments regarding Google Play. The court recalls from the briefing, initially said that he would have to check to see whether there were any blockers on their partnership with FitAngel. And then a few months later, he came back and said, well, at least one MPAA studio will, in fact, block the agreement. And so given that earlier context on what he would have to check, we can infer that there was coordination there that derived from the agreement. We also have Lionsgate's comments that we can't grant a license without DGA permission. And further, there are the e-mails that the studios sent in response to our letters introducing our new technology. And I think this is powerful evidence of coordination, because here the studios keep saying that they did everything independently. They keep just reacting independently to any stimulus in the marketplace. But we sent these letters separately to the studios, and there they did not react independently. They sent 124 e-mails immediately in one month alone to each other, to other MPAA studios, and to the MPAA itself. And so we think that's powerful evidence of coordination. And another point while we're on the e-mails, the only reason that we're even aware of those e-mails is because we got a little bit of discovery in the copyright litigation. And yet the studios here keep insisting that we won't find any evidence of any collusion if we actually get discovery. And so that's most of the direct evidence on coordination. We also have powerful, we think, circumstantial evidence of coordination. First place, they have refused to take advantage of this profitable sales outlet, which is the filtering market. It's demand of 56 million people, 47 percent of parents that want filtering services. And it's a powerful enough constituency that actually got Congress to pass a law protecting some filtering. And so we think that's a pretty powerful constituency there. And yet they haven't done anything to take advantage of those profits. And the reason that they haven't done so, we think, is their motive for joint action. And just to note, that is one way that we distinguish Twombly, where there was no allegation of need for joint action. And so here it's a similar motive that was at play in an interstate circuit. They are these dominant players in this industry, and they want to preserve the status quo, avoid the disruption that might occur from some studios acting differently and one studio going into the filtering market. That's the same. They're trying to avoid that same disruptive consequence with the VCR and Redbox. And so you see that here. And here there is a real risk that one studio will enter into the filtering industry because of that huge demand. And so theory is that instead what they did to eliminate that uncertainty and eliminate that risk, they decided to all take the same action and boycott filtering companies. And of course, again, the studios say, well, no, we had independent reasons for doing all of this. But again, they're just trying to convert this into a motion to dismiss under the PSLRA or the summary judgment standard, as the district court even recognized during the hearing at least twice that it seems like the studios are sure arguing fact issues. And then unfortunately, the district court was convinced by the studio's misunderstanding of the proper standard, because the proper standard, as this court discussed in Starr versus Baca and multiple other courts have discussed, as we briefed, that we simply do not have to exclude their possible alternative explanations at this stage. All that matters is that we have a plausible theory that they colluded to boycott filtering companies. And we have that through our direct evidence of coordinated conduct and also the circumstantial evidence that absent collusion, at least one studio would have entered into the filtering market. I'd like to ask you a question about your e-mails. And is that what you're basing your conspiracy? Are you really hanging your hat on the conspiracy or is it the effect of the response that you got or no response? I'd like you to address that plus the vertical conspiracy arguments that you make. How can you show that the studios have market power if each of the studios share the market is below 30 percent? I'll start with the e-mails, which is still on the horizontal claim, and then I'll turn to the vertical claim and market power if that's all right with Your Honor. Well, good, because aggregation is only appropriate if you can allege plausible facts. And I thought you were shoving the e-mails in there, too. No, we are just to be clear, and now I might reverse myself a little bit on what I said I was going to do. But on the vertical claim and market power, we are not relying on aggregation. Obviously, if you agree with me that we have alleged the horizontal conspiracy, then we automatically have market power. And I think even the studios concede that. But we are also independently saying that the studios, each studio had market power, even if you disagree with me about showing collusion among the studios. But about the collusion in the e-mails, it is just one factor that we are hanging our hat on. Our hat is being hung on, I guess, multiple rungs. We do think that the e-mails are useful because for two points. One, again, is that it rebuts this idea that everything they did, they did independently, because when we finally actually got them to reveal anything about their internal communications, it showed coordination. And so we think that that is important, and it also shows, I think, or helps us distinguish Twombly in some ways. Remember, Twombly, the main concern and the reason that the court articulated this plausibility requirement is that without that requirement, there's really no where for the defendants to begin in responding to, in defending against the plaintiff's allegations. You need to give them somewhere to look because if you just say, well, parallel conduct, plus a conspiracy label, they don't know where to look. But we've given the studios plenty of places to be in between everything that I've discussed, Chromecast, Google Play, YouTube, all of that. And so we're not solely relying on the e-mails. If I could turn to the vertical claims, I do want to make sure I save some time for rebuttal. Well, if you think you have given enough facts to survive Twombly and Iqbal, then you obviously disagree with the ruling. But are you also addressing whether or not you would be able to add any factual allegations if given the opportunity to amend the complaint? Well, we do think that we've stated enough. If the court thinks that we haven't, we would be happy to fill in whatever gaps that the court might find. I know the studios have mentioned, I think, in 15 or 16 or something places in their briefs that we're adding new arguments. We don't think that's true. We think that's probably a misunderstanding of some things. But we could fill in those gaps as far as the specific details. If the court has any particular questions, I'm happy to address that. I do want to make sure that I get to the vertical claims since Your Honor did ask about that. And as you noted, the district court dismissed that because of that 30 percent market share threshold. And with respect to the district court, it simply misread that case law. As we briefed there, that just doesn't exist in the case. And I think the studios actually agree. They try to frame it as a 30 percent presumption. And I don't think they drew that even from any case. What is in the case law is exactly what this court has said, which is that market power is generally a factual question. And the reason it's a factual question is that, and this is what the court said in Rebel Oil footnote 10, you need to carefully analyze certain telltale factors in the relevant market. The market is going to different markets will have different factors that are relevant. And here, because the ultimate question is whether someone can force a purchaser to do something that the purchaser would not do in a competitive market. And I don't know if it takes much imagination to say that if Disney, for instance, tells a downstream licensee that they don't get they don't get to license Star Wars, if they partner with a filter, that downstream licensee is going to park, is going to listen to Disney instead of these neophyte filtering companies out like good angel. If I could reserve the remainder of my time, unless the court has further questions right now. Good morning and may please the court. Don really for appellees. Good angels antitrust counterclaims depend on implausible conspiracy theories, unsupported by any non conclusory factual allegation. They are precisely the kinds of allegations that the Supreme Court said in Twombly and Iqbal should be dismissed at the threshold. And if I could, I think a helpful place to start would be with the standard that ought to apply here. Now, my friend has suggested that the standard he wants you to apply comes from this decision of the circuit in Star. I would respectfully suggest that there are two other precedents, one in particular, far more directly relevant to understanding how the Twombly standard applies here. That's the musical instruments case from 2015 at 798 F3rd and the Kendall case. And with the court's permission, I think maybe the best way to get at the standard that applies here is just, if I could just quote the court two sentences from the decision in musical instruments. First one appears at the bottom of page 1193 and carries over to 1194. And here's what it says about this exact scenario, the case of an allegation of horizontal conspiracy to be inferred from parallel conduct. What it says is Twombly requires that when allegations of parallel conduct are set out to make a section 1 claim, i.e. as here, plaintiffs must plead enough non-conclusory facts to place that parallel conduct in a context that raises a suggestion of a preceding agreement. And then again, quoting the Kendall decision, another decision from the circuit, dismissing at the threshold under Twombly a horizontal conspiracy claim, allegations of fact that could just as easily suggest rational business behavior by defendants as they could suggest an illegal conspiracy are insufficient. So what my friend says is you can't choose between competing inferences at the motion to dismiss stage. But that principle only applies once the plaintiffs have crossed the threshold of plausibility. And to cross the threshold of plausibility in an antitrust horizontal conspiracy case, they've got to meet the test that Twombly and musical instruments set out. And they just don't. And it's particularly important that that standard be applied in the way that Twombly directed and that musical instruments did because after all, in a case like this, the parallel conduct alleged by each individual defendant or counterclaim defendant here is perfectly lawful unless it is the product of a conspiracy. It's 100% lawful for each of us individually to do the things that each company was alleged to have done here. It's only if it was a conspiracy that there's any reason to move forward with litigation. And so now if I could, I'd turn to the specific allegations they make and turn first to the Director's Guild Agreement. We think Judge Barat was 100% correct in the way he read that agreement. I think if you look at Section 7509, not only does it presuppose that the studios can enter into licensing agreements with television networks and airlines and everybody else that allows them to commit to editing, it says it right there. It says it right there that they commit to editing.  And what it does and the rights that it itself describes are rights of consultation for directors. So I think Judge Barat was absolutely right about that. Your Honor's point that this was written in 1978 before anybody even thought something like streaming could occur also suggests how implausible this allegation is. But you don't need to reach a definitive interpretation here in order to make a judgment about whether they've pled a plausible horizontal conspiracy claim under the DGA. This case is just like musical instruments. This is a hub-and-spoke conspiracy allegation. The argument here is, well, at the hub is the Director's Guild. Each studio agrees to the collective bargaining agreement and from that fact you can infer that each studio at the end of each spoke of agreement agreed with all the other studios to do that. That's their theory. Let's just take a step back. It doesn't make any sense. Each studio has an independent interest, as the District Court found, and it's exactly the same as in musical instruments, an independent interest to enter into that agreement because they don't want to alienate the directors who are critical to their business. Not only that, but of course, it's a collective bargaining agreement. If they don't sign it, they can't have any directors work for them. My friend has cited Interstate Circuit, but you think about Interstate Circuit and it's just the polar opposite of this case. Interstate Circuit was a situation in which the most powerful movie exhibitor went to the distributors and said, Look, these second-run movie houses are killing us, so I want each of you to agree to set a minimum resale price. It was a price-fixing conspiracy. In a price-fixing conspiracy, you would be crazy to agree to that unless you knew that all of your other competitors were going to agree because you'd be slitting your own throat. That's the situation in which you can infer a horizontal conspiracy from a hub-and-spoke situation, but you don't have anything like that here. It's exactly the opposite. So with respect to the DGA agreement, the District Court is completely right. No plausible inference of conspiracy. Now, moving to there, they have a narrower horizontal conspiracy claim, and that's that the three studio plaintiffs, counterclaim defendants, got together and agreed among themselves not to do business with VidAngel in a conspiratorial way. Again, every one of the allegations that they have is parallel conduct. No non-conclusory factual allegation of collusion. And once again, as with the hub-and-spoke DGA conspiracy, in this situation we have not one, but two very powerful explanations why each studio independently would make a judgment not to do business with VidAngel. The first is the same one that applies in the DGA context, which is they don't want to alienate the directors who are critical to the business. But the second, of course, is that the reason all of this transpired is because each of these studios received a letter from VidAngel in July of 2015, which led to the copyright action that was the subject of this Court's prior ruling. That they infringed. That finding violation of the anti-circumvention provisions and blatant massive infringement. Well, what do you expect us to do as individual companies when somebody says, hey, you know, I've taken the disks, I've broken down the anti-circumvention protection, I've ripped them, I've copied them, I'm distributing them, I'm making thousands of dollars doing that, I want you to license me. Counsel, I think there's two very strong arguments, one being that the agreement is a collective bargaining agreement and a powerful incentive to not alienate that group, I think is very powerful and you make it loudly and clearly. And then the other is the one you just alluded to that we finally got to about where this all started, which is the reverse of positions on allegations of infringement. But his argument is that he doesn't have to eliminate every one of your reasons. So do you want to respond to that? Yes, he doesn't, but he has to meet the standards I quoted from Twombly and musical instruments and Kendall. He's got to allege non-conclusory facts beyond the facts of parallel behavior. They've alleged non-conclusory facts about parallel behavior. Company X signed the DGA, company Y signed the DGA. So he says in the copyright action we got a whole lot of emails and quite a flurry of activity in response to the letter. What is your response to that, that he has enough to get to the next step of litigation? That's his argument. I think, Your Honor, in a situation in which several things are true, one, the explanation for why each company individually would refuse to deal is so powerful and so obvious and exactly the same as musical instruments, where, by the way, there was also communication among the various parties that were alleged to have conspired, and that was still dismissed. When you have that, on top of that, these were emails from lawyers back and forth to each other trying to figure out what to do about whether to sue for copyright infringement. That's what those were. They don't have any non-conclusory allegation that any of that involved efforts to collude. They were deciding whether or not to sue, which they have every right to do, and, of course, the suits themselves are protected by Norr Pennington. They can't possibly be a basis for finding any trust liability here. And I do think that's of a piece with their other allegations that I think it's important to look at them. They say, well, there's other evidence out there that shows that there was actually a basis for collusion here, even in this sort of second horizontal sense. And they talk about YouTube. Well, I would ask the Court to look at page 277 of the excerpts of record and paragraph 47 of the complaint, which you find there. Just look at the allegation. It's totally 100% conclusory. They just say, well, YouTube told us that we were acting in violation of their terms of service. The reason they did that is because the studios told them to do it. But it's completely conclusory. Same thing with Google, which is on the same page, 277, paragraph 45, exactly the same thing, totally conclusory. And those are allegations just like the ones in Iqbal that the Supreme Court said can't get you over the threshold at the beginning. Remember in Iqbal, the allegation was somebody who was detained in the immediate aftermath of 9-11, subjected to some very harsh treatment. He alleged that, A, that treatment was visited upon him for discriminatory reasons because of his ethnicity and religion, and, B, that it was ordered by the Attorney General and the Director of the FBI. And what the Supreme Court said was, well, yes, you've alleged that the Director of the FBI and the Attorney General ordered this, but you don't have any non-conclusory factual allegation to support that, and therefore it doesn't get over the plausibility threshold at the beginning. This is exactly the same thing with respect to those two provisions. And now with respect to the—I'm happy to stay on horizontal conspiracy if you'd like, but I think maybe since there were questions about vertical conspiracy, I'd like to address that, and I'd also like to talk about the question about amendment. Let me ask one question before you leave this subject. What is your response, the studio's response, to that—who was it?— Lionsgate's interpretation of the DGA agreement? So several points about that, Your Honor. First, I mean, if one looks at the allegation, all that's alleged is that Lionsgate said, I'm not going to do business with you unless you get the Director's approval. It doesn't say anything about whether that was based on their interpretation of the agreement or not. It's in microcosm the same problem that their theory has in macrocosm, in that Lionsgate may have had the same independent incentive everybody else did, not to alienate the Directors and say, look, we're not going to do this business with you until you get the Directors on board. But even if—and I think this is a very important point— even if one misinterpreted this agreement in defiance of its plain terms as requiring permission before any editing or filtering could occur, that still doesn't tell you anything about whether there's a horizontal conspiracy. That gets back to the hub and spoke and interstate circuit discussion we had before. It doesn't tell you anything about that. So the Lionsgate allegation doesn't provide any factual support from which you can infer conspiracy at the ends of the spokes there. Because you don't know why Lionsgate made the statement. Right, and that's all there is. That's all they've got. And then they said, well, if you give us leave to amend, we can add facts about the participants and timing. Well, that's not going to tell you anything more either. So it would be pointless there with respect to that. It's not a reasonable inference to infer that the studios used a DGA agreement as a vehicle for their conspiratorial conduct. Respectfully, Your Honor, it isn't because for two reasons. I'm just going to summarize what I tried to convey before. First, there is no, aside from parallel conduct, there are no non-conclusory factual allegations from which one could infer conspiracy. And second, there isn't an economic motive for conspiracy. Everybody who signs that DGA has a powerful individual incentive to sign it. It's a collective bargaining agreement. You can't work with the directors without them. You don't want to alienate the directors on this issue anyway. And so given that every, I mean, each individual studio would sign that DGA even if some other studio was crazy enough not to sign it. So there's just no basis for inferring that they colluded with each other to make this whole system come about. There's just no basis for it at all. But why shouldn't they be given leave to amend? So let me address that if I could. First, again, I direct the Court to Kendall and musical instruments. Both cases postured exactly like this one. Motion, first amendment, amended complaint so that the plaintiff and trust plaintiff had an opportunity in the trial court to amend once. District court dismissed under Twombly, came up both times in Kendall and musical instruments. The Court affirmed the dismissal with prejudice. It wasn't discussed in musical instruments. It was discussed in Kendall. Kendall said that the district court identified a proper reason to exercise its discretion to dismiss with prejudice without leave to amend. And it was that the district court assessed what it knew based on its familiarity of the case and concluded that there were no factual allegations that they could plead that would remedy the problem. That's exactly the rationale that Judge Barat gave in his order here in this case. And I think it's very important to read that in context. And there are two contextual points that are super critical. First is this. They filed their initial counterclaim. We moved to dismiss. I see my time is up. You can answer the question. We moved to dismiss. So they saw our arguments about what was deficient about their counterclaim complaint. They saw them. We moved to dismiss. They, on their own initiative, filed a first amendment complaint in response to our motion to dismiss. So they know, they knew what the problems were. They did what they could do to solve those problems. And then we filed a renewed motion to dismiss, and it was that renewed motion to dismiss that was adjudicated and that Judge Barat decided on. And then the second point, if I could on this, the second context point which I do think is critical, direct the court to excerpts of record 115 to 125. There's a colloquy at the hearing about the motion to dismiss in which Judge Barat raises this. He raises the question, well, you know, if I agree with you, studios, on the merits, shouldn't I give them leave to amend? Or should I give them leave to amend? And what our counsel said at that moment was, before doing that, Your Honor, you should have them identify to you what specific additional facts they would plead if you gave them that opportunity. And then our counsel made a lot of specific points about what they would need to show. I just direct you to read the colloquy. They didn't say one thing. Thank you, counsel. Thank you. You're well over your time. We're going to add another minute to your time because we went over. Right ahead. Thank you, Your Honor. If I could make a few points. And I do want to especially address the two arguments that Judge Christin mentioned that you thought might be powerful on their side. But first, if I could make a quick point on the leave to amend. In Kendall, the plaintiffs had discovery. And if you look at that opinion on pages 1051 to 1052, the court specifically notes that it is denying leave to amend because they already had an opportunity to obtain some discovery in Kendall. But to go to Judge Christin's arguments, one of those was the director's preferences against editing. And, of course, that provides a possible explanation for their conduct, but it is not the only plausible explanation. We have our own story. And to address the wishes, particularly a two-point one is that, as we discussed at pages 17 to 18 of our reply brief, the directors have allowed multiple exceptions to what the studios seem to think is this blanket no editing policy, including product placement, and making changes to the films to make them more commercial in response to test audience reactions. And so, again, this is a factual issue that they're trying to raise. They want us to have some kind of smoking gun here. I don't know that it's fair to call it a factual issue. I mean, you do have the burden to give us a plausible theory, and these seem to me to be two really important reasons, obvious reasons for what it is you're complaining about. Well, I think it seems like an obvious reason because they are saying that, well, the directors would not allow this. Collective bargaining agreement, right? With a very important constituency. So what's your best shot? Why doesn't that give me a powerful reason to think that your argument is not plausible, sir? Two responses. First, even if they are all responding to the demand of a common, important, extremely important constituency, if they're doing it together, that is collusion. And we know that because of interstate circuit. How do we know they're doing it together? Because each of them signed the agreement knowing that the others were also signing. But even taking the director's preferences at face value, we have still alleged that there is this huge demand for filtering services, and they don't deny this. And so we have a plausible story, as courts have held, that it's suspicious to avoid a profitable sales outlet. And so that's why there's this – What if it's a profitable sales outlet? I mean, in fairness, what is your response to the notion that it's perhaps a potentially profitable business model they're free to take or leave, and in this case, perhaps they're leaving it because their view is that your client infringed? Two responses. One is, again, that is a possible calculation that one studio might make. But we have a plausible story, especially given all our other allegations, that what actually happened here was the studios got together and agreed that we should all respond to the director's preferences in the same way to avoid any disruptive consequence, to avoid one studio going first into the filtering market because there is some uncertainty there. And so they were getting together to eliminate some studios doing one thing, some studios doing another, just like an interstate circuit where the defendants had that same kind of motive. And that's why it is important that the directors have allowed some exceptions, because that means that it is reasonable to think that given this huge demand to enter the filtering market, at least one studio would. I see I have about 30 seconds if I could address the copyright issue that Your Honor mentioned. And it's an initial matter. We, of course, that litigation is ongoing. We are planning on fighting that all the way to final judgment. But the important point here is that most of the – I'm sorry. You say that's ongoing? Well, it's been stayed pending Vittingel's bankruptcy. But it's not a final judgment yet. But it's in Chapter 11, right, still? Is that right? That's correct. So nothing is going on in the district court now? That's correct. So I just mean there hasn't been a final judgment. If I could just take 30 seconds to respond to your concern about the copyright litigation, Your Honor. It simply does not mean that the studios acted independently because most of our allegations address conduct that occurred before we even introduced that technology. And so the copyright issue cannot possibly explain everything that happened before that. And this is YouTube, Chromecast, Google Play, all of that occurred before. And so the copyright issue simply has no relevance. Thank you. Thank you both for your arguments. We're going to take a short recess, about five minutes, and then we'll be back.
judges: Tashima, Christen, Rufe